GALATEA DELAPP
Attorney at Law
1541 E Fairmont Ave.
Fresno, CA 93704
(559) 803 0471

Attorney for Defendant
Bryan Williams

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No: 24-CR-00199-JLT-SKO |
| Plaintiff, | DEFENDANT'S FORMAL OBJECTIONS TO THE PRESENTENCE REPORT & SENTENCING MEMORANDUM |
| v. | Honorable Jennifer Thurston |
| BRYAN WILLIAMS, | Date: September 8, 2025 |
| Defendant. | Time: 9:00 AM |

## I. INTRODUCTION

Defendant Bryan Williams respectfully submits that a sentence of probation is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a). This submission is supported by two primary arguments:

First, the Court should calculate the advisory sentencing guideline range based on a loss amount of $228,274, as substantiated by binding settlements with federal regulatory agencies, not the unsupported estimate of $429,778.40 in the PSR. This results in a 10-level increase under USSG §2B1.1(b)(1)(F). Combined with the government's contracted agreement to recommend a 2-level downward variance for "notable acceptance of responsibility," the correct Total Offense Level is 14, yielding a guideline range of 15-21 months.

Second, even within this lower range, the factors under 18 U.S.C. § 3553(a), including Mr. Williams's extraordinary acceptance of responsibility, coming forward of his own volition, fully

1

cooperating with every investigating agency without an attorney, paying restitution years before indictment, profound rehabilitation to become a licensed clinical social worker serving the mentally ill, and the devastating impact of incarceration on his family overwhelmingly support a sentence of probation with conditions.

## II. FORMAL OBJECTIONS TO THE PRESENTENCE REPORT

### A. Objection to Loss Amount and Restitution Calculation (PSR ¶¶ 5, 12, 14, 21)

The PSR's reliance on an estimated loss "between $400,000 and $500,000" (¶5) and its calculation of $429,778.40 (¶12) is clearly erroneous and not supported by a preponderance of the evidence. See *United States v. Kilby*, 443 F.3d 1135, 1141 (9th Cir. 2006) (government bears burden of proving loss amount by a preponderance).

The most reliable evidence of loss comes from the definitive findings of the Federal Election Commission (FEC), the federal agency with primary jurisdiction over the campaign finance violations at issue. The FEC Conciliation Agreement (Exhibit A) states the loss was "approximately $272,000 in unauthorized disbursements[1]," of which Mr. Williams had repaid "$218,546.30." (*Id.* pgs. 2-4). The victim committee itself, the Kern County Republican Central Committee (KCRCC), agreed with this figure in its own FEC Negotiated Settlement (Exhibit B - FEC Negotiated Settlement at 1). The government's decision not to seek restitution (PSR ¶14) is its tacit admission that it cannot prove the higher figure at trial. The $400,000-$500,000 figure originates from an unverified, early claim by a third party mentioned in an FBI electronic communication. (Exhibit C - FBI EC at 2). This speculative estimate is superseded by the FEC's authoritative, investigated conclusion.

The Court should find the intended loss for guideline purposes is $228,274 (approximating the repaid amount in the PSR and FEC agreement). This warrants a 10-level increase under USSG §2B1.1(b)(1)(F), not a 12-level increase.

### B. Objection to Characterization of Discovery and FBI Interview (PSR ¶¶ 6, 11)

---

[1] Some of the checks written to Mr. Williams were actual reimbursements for legitimate expenses, and some of the funds originally listed as owed included times that the defendant was not working for the committees.

The PSR's phrasing in ¶6 suggests the KCRCC detected the fraud before Mr. Williams acted. This is misleading. The record shows Mr. Williams voluntarily self-disclosed his misconduct and provided restitution before any formal investigation. This is the core of his acceptance of responsibility.

Similarly, describing the FBI interview as "surreptitious" (¶11) is pejorative and inaccurate. Mr. Williams cooperated fully, admitting his wrongdoing immediately. The term unfairly implies deceit, contradicting his documented pattern of transparency and cooperation that began with his initial confession.

The Court should amend the PSR's narrative to accurately reflect that Mr. Williams voluntarily disclosed his conduct and cooperated with authorities from the outset.

### III. THE CORRECT ADVISORY GUIDELINE RANGE

Based on the objections above, the correct guideline calculation is as follows:

Base Offense Level: 7 (USSG §2B1.1(a)(1)) [Stipulated]

Specific Offense Characteristic (Loss): +10 ($228,274 falls within $150,000-$250,000) (USSG §2B1.1(b)(1)(F))

Abuse of Trust: +2 (USSG §3B1.3) [Stipulated]

Adjusted Offense Level (Subtotal): 19

Acceptance of Responsibility: -3 (USSG §3E1.1(a) & (b)) [Stipulated]

Government-Recommended Variance: -2 (Dkt. 2 - Executed Plea Agreement at 5, ¶III.B.1)

Total Offense Level: 14

With a Criminal History Category of I, the advisory guideline imprisonment range is 15-21 months.

### IV. SENTENCING UNDER 18 U.S.C. § 3553(a)

A sentence within the lower guideline range, or a downward variance to probation, is sufficient to meet all sentencing goals.

//

//

**A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

1. Extraordinary Acceptance of Responsibility:

Mr. Williams's conduct is the textbook definition of acceptance. He voluntarily confessed, repaid over $218,000 years before being charged, and cooperated fully with investigators. The government itself recognized this by contracting to recommend a 2-level downward variance for his "notable acceptance of responsibility." (Dkt. 2 - Plea Agreement at 5.)

2. Profound Rehabilitation and Positive Contributions:

Mr. Williams has completely rebuilt his life. He earned a Master of Social Work (Exhibit D, CSU Bakersfield Diploma) and is a Licensed Clinical Social Worker (PSR ¶52). After he came forward and admitted his crime, voluntarily submitted restitution which he borrowed money to do and is in the process of paying that loan back, he went on to serve the most vulnerable, working with "the most violent, and most mentally ill men in our state" at Atascadero State Hospital. Exhibit E, Trotta Character Letter. His work was not just a job; it was a critical service. As detailed in Exhibit F, Brown Character Letter, he provides essential, often unpaid, counseling to families in crisis.

3. Strong Family Ties and Hardship:

Mr. Williams is a devoted husband and father to a 10-year-old son. His wife suffers from significant health issues, including high blood pressure, a heart murmur, depression, and anxiety. PSR ¶46. His incarceration would impose an extreme hardship on them, effectively making them secondary victims of this punishment.

4. No Criminal History: Mr. Williams has no prior criminal record. PSR ¶35. This offense was an aberration.

**B. The Need for the Sentence Imposed**

1. Just Punishment: Mr. Williams has already been severely punished. He lost his career when he entered his plea, he suffered public humiliation when he came forward with his crimes and it was reported in the news, he borrowed money to pay over $218,000 in restitution and faced significant civil penalties from the FEC (Exhibit A) and the Fair Political Practices Commission (Exhibit G, FPPC

Stipulation). A felony conviction and a term of probation are severe punishments that satisfy the need for just punishment.

2. Adequate Deterrence: The consequences he has already endured, financial ruin, career loss, and public shame are powerful deterrents to him and others. Further incarceration is unnecessary for deterrence.

3. Protect the Public: Mr. Williams poses zero danger to the public. He is a contributing, healing member of society. His risk of recidivism is negligible.

4. Provide Correctional Treatment: Mr. Williams does not need correctional treatment. He is a treatment provider. Community service would be a far more productive use of his skills than incarceration.

## V. CONCLUSION AND REQUEST FOR NON-CUSTODIAL SENTENCE

For the foregoing reasons, Mr. Williams respectfully requests that the Court sustain his objections to the PSR; Find the correct advisory guideline range is 15-21 months (or lower); Grant the government's recommended 2-level downward variance; and Impose a sentence of probation with conditions, such as community service, as such a sentence is sufficient to comply with all purposes of 18 U.S.C. § 3553(a).

Dated: August 28, 2025

By: /s/ Galatea R. DeLapp
Galatea R. DeLapp, Esq.
Attorney for Defendant
Bryan Williams

# EXHIBIT A

FEC Conciliation Agreement



FEDERAL ELECTION COMMISSION
Washington, DC  20463

December 23, 2021

**Via Email**

Bryan Williams

Bakersfield, CA 93301

RE:     MUR 7922 (Bryan Williams)

Dear Mr. Williams:

On December 14, 2021, the Federal Election Commission accepted the signed conciliation agreement and civil penalty in settlement of violations of 52 U.S.C. §§ 30102(b)(3), 30102(c), 30104(b) and 11 C.F.R. §§ 102.9, 102.15, and 104.3 of the Federal Election Campaign Act of 1971, as amended and Commission regulations.  Accordingly, the file has been closed in this matter.

Documents related to the case will be placed on the public record within 30 days.  *See* Disclosure of Certain Documents in Enforcement and Other Matters*, 81 Fed. Reg. 50,702 (Aug. 2, 2016).*  Information derived in connection with any conciliation attempt will not become public without the written consent of the respondent and the Commission.  *See* 52 U.S.C. § 30109(a)(4)(B).

Enclosed you will find a copy of the fully executed conciliation agreement for your files. Please note that the civil penalty is due within 30 days of the conciliation agreement's effective date.  If you have any questions, please contact me at (202) 694-1021.

Sincerely,

*Richard Weiss*

Richard L. Weiss
Attorney

Enclosure
  Conciliation Agreement

# BEFORE THE FEDERAL ELECTION COMMISSION

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Bryan Williams | )  · MUR 7922 |
| | ) |

## CONCILIATION AGREEMENT

This matter was initiated by the Federal Election Commission (the "Commission"), pursuant to information ascertained in the normal course of carrying out its supervisory responsibilities. The Commission found reason to believe that Bryan Williams ("Respondent") knowingly and willfully violated 52 U.S.C. §§ 30102(b)(3), 30102(c), 30104(b), and 11 C.F.R. §§ 102.9, 102.15, and 104.3.

NOW, THEREFORE, the Commission and Respondent, having participated in informal methods of conciliation, prior to a finding of probable cause to believe, do hereby agree as follows:

I.      The Commission has jurisdiction over Respondent and the subject matter of this proceeding, and this agreement has the effect of an agreement entered pursuant to 52 U.S.C. § 30109(a)(4)(A)(i).

II.     Respondent has had a reasonable opportunity to demonstrate that no action should be taken in this matter.

III.    Respondent enters voluntarily into this agreement with the Commission.

IV.     The pertinent facts in this matter are as follows:

1.    Kern County Republican Central Committee (the "Committee") is a political committee within the meaning of 52 U.S.C. § 30101(4).

2.    Williams was the treasurer of the Committee from March 18, 2013, to February 20, 2019.

3. The Act and Commission regulations require treasurers to accurately keep a record of and report receipts and disbursements. 52 U.S.C. §§ 30102(c), 30104(b); 11 C.F.R. §§ 102.9(b), 104.3(a)-(b).

4. The Act and Commission regulations require that all funds of a political committee be "segregated from, and may not be commingled with, the personal funds of any individual." 52 U.S.C. § 30102(b)(3); 11 C.F.R. § 102.15.

5. A knowing and willful violation of the Act requires full knowledge of all of the relevant facts and a recognition that the action is prohibited by law.

6. From 2013 to 2019, in his capacity as treasurer of the Committee, Williams made approximately $272,000 in unauthorized disbursements from the Committee's bank account to his personal bank accounts and personal credit cards. Those funds that Williams deposited into his personal bank resulted in prohibited comingling.

7. Williams did not keep records of his unauthorized disbursements and deposits, and he failed to disclose these unauthorized transfers in the Committee's reports he filed with the Commission, which resulted in the Committee filing inaccurate reports with the Commission.

8. Williams has paid $218,546.30 in partial restitution to the Committee.

9. The fact that Williams falsified memo and description fields of the transactions, never provided copies of Committee invoices or his credit card statements for review, and instead, provided falsified information demonstrates his intent to conceal his conduct and that he acted knowingly and willfully.

V.     Respondent committed the following violations:

1.   Respondent knowingly and willfully violated 52 U.S.C. § 30102(c) and 11 C.F.R. § 102.9 by failing to keep an account of disbursements made from the Committee's funds.

2.   Respondent knowingly and willfully violated 52 U.S.C. § 30104(b) and 11 C.F.R. § 104.3 by failing to file accurate reports with the Commission.

3.   Respondent knowingly and willfully violated 52 U.S.C. § 30102(b)(3) and 11 C.F.R. § 102.15 by commingling the Committee's funds with his personal funds.

VI.     Respondent will take the following actions:

1.   Respondent will pay a civil penalty of Twenty Thousand Five Hundred and Twenty-Eight Dollars ($20,528) pursuant to 52 U.S.C. § 30109(a)(5)(B).

2.   Respondent will cease and desist from violating 52 U.S.C. §§ 30102(b)(3), 30102(c), 30104(b), and 11 C.F.R. §§ 102.9, 102.1, and 104.3.

3. Respondent, through the submission of financial documentation to the Commission, has indicated that although financial hardship prevents him from paying the full civil penalty to the Commission, he is able to pay a substantially reduced civil penalty of Twenty Thousand Five Hundred and Twenty-Eight Dollars ($20,528). The Commission regards this submission as a material representation. Due to Respondent's financial condition, the Commission agrees to depart from the civil penalty that it would normally seek for the violations at issue, and the Commission agrees that the reduced civil penalty of $20,528 shall be due.

VII.     The Commission, on request of anyone filing a complaint under 52 U.S.C. § 30109(a)(1) concerning the matters at issue herein or on its own motion, may review compliance with this agreement.  If the Commission believes that this agreement or any

requirement thereof has been violated, it may institute a civil action for relief in the United States

District Court for the District of Columbia.

VIII.    This agreement shall become effective as of the date that all parties hereto have

executed same and the Commission has approved the entire agreement.

IX.    Respondent shall have no more than thirty (30) days from the date this agreement

becomes effective to comply with and implement the requirements contained in this agreement

and to so notify the Commission.

X.    This Conciliation Agreement constitutes the entire agreement between the parties

on the matters raised herein, and no other statement, promise, or agreement, either written or

oral, made by either party or by agents of either party, that is not contained in this written

agreement shall be enforceable.

FOR THE COMMISSION:

Lisa Stevenson
Acting General Counsel

BY: *Charles Kitcher*                          12-23-21
      Charles Kitcher                        Date
      Acting Associate General Counsel
       for Enforcement

*Bryan Williams*                              10/28/2021
Bryan Williams                                Date
Respondent

# EXHIBIT B

FEC Negotiated Settlement



FEDERAL ELECTION COMMISSION
WASHINGTON, D.C. 20463

## NEGOTIATED SETTLEMENT

This matter was initiated by the Federal Election Commission (FEC or the Commission) pursuant to information ascertained in the normal course of carrying out its supervisory responsibilities. Following review of the matter, and in an effort to promote compliance with the Federal Election Campaign Act of 1971, as amended, (FECA) and resolve this matter, the Federal Election Commission (FEC or the Commission) entered into negotiations with Charles H. Bell, Jr., Esq., representing Kern County Republican Central Committee (Fed) and Laurel Sheffield, in the official capacity of Treasurer (the Committee or Respondents). It is understood that this agreement will have no precedential value relative to any other matters coming before the Commission.

Negotiations between the Commission and Respondents addressed the issues raised in this referral. The parties agree to resolve the matter according to the following terms:

1. The Commission entered into this agreement as part of its responsibility for administering the FECA, and in an effort to promote compliance on the part of Respondents. The Commission's use of alternative dispute resolution procedures (ADR) is guided by "The Administrative Dispute Resolution Act of 1996," 5 U.S.C. § 572 and is an extension of 52 U.S.C. § 30109.

2. Respondents voluntarily enter into this agreement with the Commission.

3. The Reports Analysis Division (RAD) referred Respondents after the Committee disclosed the refund of unauthorized disbursements totaling $218,546.39 on their 2019 Mid-Year Report, filed on July 31, 2019. Respondents filed a *sua sponte* submission on October 23, 2020, acknowledging that their 2019 Mid-Year Report reflected two refunds from their former treasurer[1] comprising the partial restitution of embezzled funds. From 2013 to 2019, the former treasurer made approximately $272,000 in unauthorized disbursements, which he failed to accurately disclose on the Committee's reports resulting in the Committee filing inaccurate reports with the Commission.[2]

---

[1] Bryan Williams was the treasurer from March 18, 2013, to February 20, 2019. The Committee amended its Statement of Organization (Form 1) on July 28, 2019, to list Laurel Sheffield as its treasurer. In the interim, Thomas E. Montgomery served as treasurer.

[2] *See* Conciliation Agreement & Cert. (December 22, 2021), MUR 7922 (Bryan Williams).

4. Political committees, through their treasurers, must report all financial activity, including maintaining an accurate account of all receipts, disbursements, and cash-on-hand balances, pursuant to the FECA. 52 U.S.C. §§ 30102 (c), 30104(b); 11 C.F.R. § 104.3.

5. The Committee acknowledges that at the time of the unauthorized disbursements, it did not qualify for safe harbor under the Commission's policy.[3] Regarding internal controls, it failed to complete monthly reviews of bank statements or reconciliations of accounting records, disbursements over $1,000 were not authorized by two persons, and an individual who does not handle the Committee's accounting or have banking authority did not monitor incoming receipts. At the time the embezzlement occurred, bank accounts were in the Committee's name and there was no petty cash system, failing to satisfy three of the five internal controls detailed in the safe harbor policy.

6. The Committee states that upon the discovery of unauthorized disbursements, it undertook an investigation; appointed a new treasurer; and implemented internal controls in accordance with the Commission's best practices for internal controls. Further, the Committee sought and obtained partial restitution from the embezzler. The Committee reported the matter to law enforcement authorities and disclosed two restitution checks on the 2019 Mid-Year Report, thus notifying the Commission of the misappropriation. The Committee states that due to difficulties obtaining records, it did not promptly file amended reports to correct reporting errors. As such, the Committee completed two of the three post-discovery steps detailed in the safe harbor policy.

7. Respondents, in an effort to avoid similar errors in the future, agree to:

   (a) certify internal control procedures consistent with those described in the Commission's Internal Controls and Political Committees advisory document (2007) and the Best Practices for Committee Management (published in the April 2009 Record, available at www.fec.gov/pages/brochures/bestpractices.shtml) and as recommended to the Committee by the FEC's Audit Division, in a memorandum dated April 13, 2022, have been followed consistently for two (2) years from the effective date of this agreement;

   (b) certify that a representative of the Committee participated in an FEC conference, webinar, or other training program developed in consultation with the FEC's Information Division within twelve (12) months of the effective date of this agreement;

   (c) file a Form 99 (Miscellaneous Electronic Submission) accurately and fully disclosing the unauthorized disbursements and adjust their cash-on-hand balance, if necessary, to clarify the public record; and

   (d) pay a civil penalty of $3,400 within thirty (30) days of the effective date of this agreement.

---

[3] *See* Statement of Policy: Safe Harbor for Misreporting Due to Embezzlement, 72 Fed. Reg. 16,695 (Apr. 5, 2007).

8. Respondents agree that all information provided to resolve this matter is true and accurate to the best of their knowledge and that they sign this agreement under penalty of perjury pursuant to 28 U.S.C. § 1746.

9. The parties agree that if Respondents fail to comply with the terms of this settlement, the Commission may undertake civil action in the U.S. District Court for the District of Columbia to secure compliance. Unpaid civil money penalties are subject to the Debt Collection Act of 1982 as amended by the Debt Collection Improvement Act of 1996 (DCIA), 31 U.S.C. § 3701 et seq. The Commission will transfer debt to the United States Department of the Treasury (Treasury) for collection.

10. This agreement shall become effective on the date signed by all parties and approved by the Commission. Respondents shall comply with the terms of this agreement as set out in paragraph 7 above and shall certify compliance with the above settlement terms in writing to the Alternative Dispute Resolution Office on or before the date each term becomes due.

11. This Negotiated Settlement constitutes the entire agreement between the parties on ADR 1067 (P-MUR 646) and ADR 1068 (RR 20L-13), and resolves those issues identified in paragraph 3 above. No other statement, promise or agreement, either written or oral, made by either party, not included herein, shall be enforceable.


FOR THE COMMISSION:

Krista J. Roche, Director
Alternative Dispute Resolution Office


_____          _____
                                                  Date Signed


FOR THE RESPONDENTS:


_____          _____
Charles H. Bell, Jr., Esq.                        Date Signed
Representing Kern County Republican Central
Committee (Fed) and Laurel Sheffield, Treasurer

# EXHIBIT C

FBI Electronic Communication

FD-1057 (Rev. 5-8-10)

UNCLASSIFIED

# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** (U) Request for Forensic Accountant     **Date:** 10/10/2019
Assistance

**From:** SACRAMENTO
      SC-BRA
        **Contact:** CALLAHAN NICHOLAS L, 661-852-2478

**Approved By:** Sean Lister
           SA Jeffrey L Jackson

**Drafted By:** CALLAHAN NICHOLAS L

**Case ID #:** 194B-SC-3137844     (U) BRYAN WILLIAMS;
                                    KERN COUNTY REPUBLICAN CENTRAL COMMITTEE;
                                    CORRUPTION OF DOMESTIC PUBLIC OFFICIAL;
                                    SENSITIVE INVESTIGATIVE MATTER

**Synopsis:** (U) To request a Forensic Accountant / Financial Analyst be assigned to the captioned investigation.

**Details:**

It is requested that a Forensic Accountant / Financial Analyst be assigned to the captioned investigation.

**Case Briefing:**

On June 27, 2019, DOUG GOSLING of the Braun Gosling Law Corporation presented an internal investigation conducted at the Kern County Republican Central Committee (Central Committee). Per GOSLING, former Central Committee member BRYAN WILLIAMS used funds donated to the Central Committee for personal use. WILLIAMS was elected by public ballot to the Central Committee during the 2012 election season and started with the Central Committee on or about February, 2013.

UNCLASSIFIED

Title:  (U) Request for Forensic Accountant Assistance
Re:  194B-SC-3137844, 10/10/2019


   GOSLING provided spreadsheets showing payments from the Central
Committee that were traced back to payments to BRYAN WILLIAMS' credit
cards. GOSLING also identified transactions where WILLIAMS was accused of
directly stealing cash that was meant for deposit. The Central Committee
used JP Morgan Chase and Citizens Business Bank.

   GOSLING estimated the total Central Committee loss between $400,000.00
and $500,000.00. GOSLING believed WILLIAMS also had access to the Kern
County Young Republicans finances, and that WILLIAMS may have taken money
from the Kern County Young Republicans as well.

   WILLIAMS has since repaid approximately $200,000.00 of the stolen
funds with an unexplained source of personal funds. A goal of the
investigation is to determine how WILLIAMS acquired funds to repay the
Central Committee in an attempt to identify other victims.

**Objectives of the Financial Investigation:**

   The first objective of the financial investigation is to identify
expenditures from the Central Committee or Young Republicans to sources
that are not for official purposes. The second objective is to identify
any other sources of illicit income for BRYAN WILLIAMS, such as
personally receiving fraudulent campaign contributions. These goals
should be accomplished through examination of personal bank and credit
accounts owned or controlled by BRYAN WILLIAMS.

**Description of Financial Analysis Work Required:**

   WILLIAMS is alleged to have several credit cards and one bank account.
The Central Committee and Young Republicans have approximately four
accounts between them. WILLIAMS is known to have several credit cards and
at least one bank account.

   The period of activity will be approximately 2013 to Present, though

**UNCLASSIFIED**

Title:  (U) Request for Forensic Accountant Assistance
Re:  194B-SC-3137844, 10/10/2019


statute of limitations will limit prosecution to the time period 2015 to Present. Timeliness of analysis will be determined as records are received, and the beginning of the theft is identified. Subpoenas for accounts were submitted on 08/29/2019.

   It is unknown how active BRYAN WILLIAM's accounts are. The Central Committee accounts were active, routinely receiving and expending funds.

   The financial analysis for this investigation may determine connections to pending investigation 194A-SC-2154301. Many debits from the Central Committee go to Western Pacific Research, and employees for Western Pacific Research are members of the Central Committee.


◆◆

# EXHIBIT D

CSU Bakersfield Diploma

# California State University, Bakersfield

## The Trustees of

## The California State University

on the recommendation of the Faculty have conferred upon

### Bryan Micahl Williams

the degree of

### Master of Social Work

with all rights and privileges pertaining thereto

Given at Bakersfield, California, on the fourteenth day of August, two thousand nineteen

Governor of California and President of the Trustees

Chancellor of The California State University

Chairman of the Board of Trustees

President of the University



# EXHIBIT E

Character Letter from Dr. Kathleen Trotta



November 18, 2024

The Honorable Jennifer Thurston
Federal Circuit Judge
US District Court - Eastern California District
2500 Tulare Street
Fresno, CA 93721

Dear Judge Thurston,

I am writing to you in support of Bryan Williams, who I understand is currently before you in your courtroom. I have had the privilege of working closely with Bryan for over three years at the Department of State Hospitals Atascadero, where we have worked closely on the same team on two separate units and shared many responsibilities. Throughout our professional relationship, I have found Bryan to be an individual of exceptional integrity, responsibility, and character. He consistently demonstrates a strong work ethic, a high standard of professionalism, and a sincere commitment to the well-being of others.

In addition to his professional demeanor, Bryan has shown a deep sense of empathy and kindness toward our team and those we serve. He is highly regarded by peers and patients alike for being approachable, dependable, and for having a genuine desire to help others. As you may know, we work with the most violent, and most mentally ill men in our state. It is a very high stress and demanding environment. The units I have worked with Bryan on are very demanding and the rigorous work in our hospital due to the location and population on the unit. My work load from 2022 to spring 2024 was astronomical due to the back log of patients adjudicated as incompetent to stand trial and their often complex clinical and court cases. Bryan was always willing to step-up and help out, engage patients in extra tutoring, adding in additional group hours, and helping both myself and patients in any way he could; often filling in gaps where I could just not keep up. He was moved from our unit earlier this year to work on an even bigger unit and his presence has been missed greatly.

I fully understand the seriousness of the matter before you, and I do not intend to minimize it. However, I feel that it is important to express that Bryan has always been someone who learns from experiences and is dedicated to personal growth. I have seen firsthand his remorse and the efforts he has made to rectify past mistakes. I believe that Bryan has the potential for positive change, and I support his continued growth.

Thank you for considering this letter as part of your assessment of Bryan. I am confident that he will continue to contribute positively to society and remain committed to making amends. Please feel free to contact me if you need any further information or clarification.

Sincerely,
Kathleen Trotta, Psy.D.
drktrotta@gmail.com
Kathleen.Trotta@dsh.ca.gov
(805) 316-0384

# EXHIBIT F

Character Letter from Judi Brown

October 24, 2024

Honorable Judge Jennifer Thurston of the US District Court of the Eastern District of California in Fresno

Dear Honorable Judge Thurston,

Good day, ma'am. My name is Judi Brown and I am writing to commend my counselor, Bryan Williams.

My husband is suffering from a progressive illness that caused an emotional, physical and spiritual breaking point for me after 3 years of solo caregiving. I was desperate and depleted. My entire world was in chaos and I couldn't achieve sufficient guidance and support through this life-altering event.

I'm not a religious person but I admit I pulled out all the stops praying for help. Those prayers were answered with the literal arrival of Bryan Williams on our doorstep. Half my battle is I don't drive, and that Bryan was willing to travel from Atascadero to our house in Morro Bay was such a relief. We offered to pay for his help and he would not accept money.

Bryan spent many hours with me in the safety and comfort of my home where I feel most at ease. His willingness to jump in as an advocate, and his calm, empathetic, open and loving demeanor has been desperately needed balm on my grief, confusion, fear and feelings of defeat. Because Bryan is part of our lives now, I feel stronger and better supported in facing the challenges that arise for us every day. Bryan has become a good friend and I consider him part of our family now.

Everyone makes mistakes; not everyone admits it and takes responsibility. Bryan has honestly and courageously informed our family of his prior error and steps taken to accept responsibility to make right.

Honorable Judge Thurston, may I humbly request that Bryan Williams be allowed to continue his crucial work in our community without interruption, restrictions, or incarceration? The genuine good this man continues to do for strangers like my family is truly an answer to our prayers and many others in distress.

Thank you for reading this commendation for Bryan Williams and considering what removing him from his family and patients would cause for those of us who depend on him.

Wishing you the very best, and a beautiful day, ma'am.

Sincerely,

Judi Brown

1045 Allesandro St

Morro Bay, CA 93442

(805)464-9164 or judibrownmusic@gmail.com

# EXHIBIT G

FPPC Stipulation

GARY S. WINUK
Chief of Enforcement
NEAL P. BUCKNELL
Senior Commission Counsel
**FAIR POLITICAL PRACTICES COMMISSION**
428 J Street, Suite 620
Sacramento, CA 95814
Telephone: (916) 322-5660
Facsimile: (916) 322-1932

Attorneys for Complainant

BEFORE THE FAIR POLITICAL PRACTICES COMMISSION

STATE OF CALIFORNIA

| In the Matter of: | FPPC No. 10/1095 |
|---|---|
| KERN COUNTY YOUNG REPUBLICANS VOTING GUIDE, KERN COUNTY YOUNG REPUBLICANS PAC, and BRYAN WILLIAMS, | STIPULATION, DECISION AND ORDER |
| Respondents. | |

## STIPULATION

Complainant, the Enforcement Division of the Fair Political Practices Commission, and Respondents Kern County Young Republicans Voting Guide, Kern County Young Republicans PAC, and Bryan Williams agree that this Stipulation will be submitted for consideration by the Fair Political Practices Commission at its next regularly scheduled meeting.

The parties agree to enter into this Stipulation to resolve all factual and legal issues raised in this matter and to reach a final disposition without the necessity of holding an administrative hearing to determine the liability of Respondents, pursuant to Section 83116 of the Government Code.

Respondents understand, and hereby knowingly and voluntarily waive, any and all procedural rights set forth in Sections 83115.5, 11503 and 11523 of the Government Code, and in Sections 18361.1 through 18361.9 of Title 2 of the California Code of Regulations. This includes, but is not limited to, the right to appear personally at any administrative hearing held in this matter, to be represented by an

attorney at Respondents' own expense, to confront and cross-examine all witnesses testifying at the hearing, to subpoena witnesses to testify at the hearing, to have an impartial administrative law judge preside over the hearing as a hearing officer, and to have the matter judicially reviewed.

It is further stipulated and agreed that Respondents committed five violations of the Political Reform Act. These violations are described in Exhibit 1, which is a true and accurate summary of the facts in this matter. Exhibit 1 is attached hereto and incorporated by reference as though fully set forth herein.

Respondents agree to the issuance of the Decision and Order, which is attached hereto, and Respondents agree to the Commission imposing upon them an administrative penalty in the amount of $11,000, of which Respondent Bryan Williams is jointly and severally liable for the full amount, Respondent Kern County Young Republicans Voting Guide is jointly and severally liable for $4,500, and Respondent Kern County Young Republicans PAC is jointly and severally liable for $6,500. One or more checks or money orders totaling said amount—to be paid to the General Fund of the State of California—is/are submitted with this Stipulation as full payment of the administrative penalty described above, and same shall be held by the State of California until the Commission issues its Decision and Order regarding this matter. The parties agree that in the event the Commission refuses to accept this Stipulation, it shall become null and void, and within fifteen (15) business days after the Commission meeting at which the Stipulation is rejected, all payments tendered by Respondents in connection with this Stipulation shall be reimbursed. Respondents further stipulate and agree that in the event the Commission rejects the Stipulation and a full evidentiary hearing before the Commission

///
///
///
///
///
///
///
///

becomes necessary, neither any member of the Commission, nor the Executive Director, shall be

disqualified because of prior consideration of this Stipulation.


Dated: _____          _____
                                        Gary S. Winuk, Chief of Enforcement
                                        Fair Political Practices Commission


Dated: _____          _____
                                        Bryan Williams, Individually and on Behalf of
                                        Kern County Young Republicans Voting Guide
                                        and Kern County Young Republicans PAC,
                                        Respondents


## DECISION AND ORDER

The foregoing Stipulation of the parties "In the Matter of Kern County Young Republicans

Voting Guide, Kern County Young Republicans PAC, and Bryan Williams," FPPC No. 10/1095,

including all attached exhibits, is hereby accepted as the final decision and order of the Fair Political

Practices Commission, effective upon execution below by the Chairman.


IT IS SO ORDERED.


Dated: _____          _____
                                        Ann Ravel, Chair
                                        Fair Political Practices Commission

Intentionally left blank

<u>**EXHIBIT 1**</u>

**INTRODUCTION**

Respondent Kern County Young Republicans Voting Guide ("Respondent Voting Guide") is a slate mailer organization. Respondent Kern County Young Republicans PAC ("Respondent PAC") is a state general purpose recipient committee sponsored by the Kern County Young Republicans. At all relevant times, Respondent Bryan Williams ("Respondent Williams") was the treasurer for both the committee and the slate mailer organization.

The Political Reform Act (the "Act")[1] requires slate mailer organizations to report certain information about disbursements made. Also, the Act imposes rules about identification of which candidates did not pay to appear in a slate mailer. Additionally, the Act requires the reporting of certain information about the making of independent expenditures.

For purposes of this Stipulation, Respondents' violations of the Act are set forth as follows:

COUNT 1: For the reporting period ending May 22, 2010, Respondents Voting Guide and Williams failed to timely report subvendor information for disbursements totaling approximately $27,020, in violation of Section 84219, subdivision (h)(5).

COUNT 2: On or about June 3, 2010, Respondent PAC sent a mailer in support of Zack Scrivner's candidacy for the Kern County Board of Supervisors. The mailer cost approximately $5,978 and was an independent expenditure. Respondents PAC and Williams were required to report the expenditure by filing a late independent expenditure report within 24 hours, but they failed to do so, in violation of Section 84204.

COUNT 3: Regarding the independent expenditure in the form of a mailer that is the subject of Count 2, Respondents PAC and Williams were required to disclose Mr. Scrivner as the candidate who received the benefit of the independent expenditure on a semi-annual campaign statement that was filed for the period ending June 30, 2010, but they failed to do so, in violation of Section 84211, subdivision (k)(5).

COUNT 4: During the reporting period ending June 30, 2010, Respondent Voting Guide produced and sent a slate mailer supporting various candidates. Some of these

_____

[1] The Act is contained in Government Code sections 81000 through 91014. All statutory references are to the Government Code as it was in effect at the time of the violations, unless otherwise indicated. The regulations of the Fair Political Practices Commission are contained in Sections 18110 through 18997 of Title 2 of the California Code of Regulations. All regulatory references are to Title 2, Division 6 of the California Code of Regulations as in effect at the time of the violations, unless otherwise indicated.

candidates did not pay for the support of the slate mailer. Respondents Voting Guide and Williams were required to disclose this on a campaign statement filed for the period ending June 30, 2010, but they failed to provide this required disclosure as to several candidates in violation of Section 84219, subdivision (e).

COUNT 5: On or about October 29, 2010, Respondent PAC sent another mailer in support of Zack Scrivner's candidacy for the Kern County Board of Supervisors. The mailer cost approximately $13,604 and was an independent expenditure. Respondents PAC and Williams were required to report the expenditure by filing a late independent expenditure report within 24 hours, but they failed to do so, in violation of Section 84204.

## SUMMARY OF THE LAW

All statutory references and discussions of law pertain to the Act's provisions as they existed at the time of the violations in question.

### Need for Liberal Construction and Vigorous Enforcement of the Political Reform Act

When the Political Reform Act was enacted, the people of the state of California found and declared that previous laws regulating political practices suffered from inadequate enforcement by state and local authorities. (Section 81001, subd. (h).) To that end, Section 81003 requires that the Act be liberally construed to achieve its purposes.

One of the purposes of the Act is to ensure that receipts and expenditures in election campaigns are fully and truthfully disclosed so that voters are fully informed and improper practices are inhibited. (Section 81002, subd. (a).) Another purpose of the Act is to provide adequate enforcement mechanisms so that the Act will be "vigorously enforced." (Section 81002, subd. (f).)

### Definition of Slate Mailer Organization

A slate mailer is a mass mailing that supports or opposes a total of four or more candidates or ballot measures. (Section 82048.3.)

Generally speaking, a slate mailer organization includes any person who, directly or indirectly, does all of the following: (1) is involved in the production of one or more slate mailers and exercises control over the selection of the candidates and measures to be supported or opposed in the slate mailers; and (2) receives or is promised payments totaling $500 or more in a calendar year for the production of one or more slate mailers. (Section 82048.4, subd. (a).)

## Definition of State General Purpose Recipient Committee

A committee includes any person or combination of persons who receive contributions totaling $1,000 or more in a calendar year. (Section 82013, subd. (a).) This type of committee commonly is referred to as a recipient committee.

Generally speaking, a state general purpose recipient committee includes any recipient committee which is formed or exists primarily to support or oppose more than one candidate or ballot measure in a state election, or in more than one county. (Section 82027.5, subd. (a).)

## Definition of Independent Expenditure

Generally speaking, an independent expenditure means an expenditure made by any person in connection with a communication which expressly advocates the election or defeat of a clearly identified candidate or the qualification, passage or defeat of a clearly identified measure, or taken as a whole and in context, unambiguously urges a particular result in an election but which is not made to or at the behest of the affected candidate or committee. (Section 82031.)

## Required Filing of Campaign Statements and Reports

Committees and slate mailer organizations are required to file certain campaign statements and reports at specified times. (Sections 84200, et seq.) For example, a state general purpose recipient committee is required to file late independent expenditure reports within 24 hours of making such expenditures. (Section 84204.)

Attached hereto as Exhibit 2 is a filing schedule for slate mailer organizations in connection with the June 8, 2010 primary election.

Attached hereto as Exhibits 3 and 4 are filing schedules for state general purpose recipient committees in connection with the June 8, 2010 primary election and the November 2, 2010 general election, respectively.

## Required Reporting of Independent Expenditures and Disbursements to Subvendors

Campaign statements filed by a committee are required to include, among other things, certain information about independent expenditures, including the date of the independent expenditure, the cumulative amount of independent expenditures made relative to a candidate or measure, the full name of the candidate, and the office and district for which he or she seeks nomination or election, or the number or letter of the measure, and the jurisdiction in which the measure or candidate is voted upon. (See Section 84211, subd. (k)(5).)

Also, slate mailer organizations are required to disclose on each campaign statement: (1) the total amount of disbursements made during the period covered by the campaign statement; and (2) the total amount of disbursements made during the period covered by the campaign statement to persons who have received $100 or more. (Section 84219, subds. (b) and (f).) For

each person to whom a disbursement of $100 or more has been made during the period covered by the campaign statement, the following information must be disclosed on the campaign statement: (1) the recipient's full name; (2) the recipient's street address; (3) the amount of each disbursement; and (4) the description of the consideration for which each disbursement was made. Additionally, this same information must be reported for each person, if different from the payee, who has provided consideration for a disbursement of $500 or more during the period covered by the campaign statement. (See Section 84219, subd. (h).) Such persons commonly are referred to as subvendors and the information pertaining to them commonly is referred to as subvendor information.

### Required Identification of Candidates Not Paying to Appear in Slate Mailers

Many times, a slate mailer organization will produce and mail slate mailers in support of candidates without receiving payment from the candidates. When this happens, the slate mailer organization is required to disclose (on the campaign statement for that reporting period) the name of each such candidate, the jurisdiction, and the office sought. (Section 84219, subd. (e).)

### Joint and Several Liability of Treasurer

The treasurer of a slate mailer organization is charged with the duty to maintain detailed accounts, records, bills, and receipts necessary to prepare campaign statements, to establish that campaign statements were properly filed, and to otherwise comply with the Act's reporting requirements. The same holds true with respect to committee treasurers. (See Sections 81004, 84100, 84104, 84108, subd. (a), and Regulation 18427.) A treasurer may be held jointly and severally liable, along with the slate mailer organization or committee, for reporting violations. (Sections 83116.5 and 91006.)

### SUMMARY OF THE FACTS

As stated above, Respondent Voting Guide is a slate mailer organization. Respondent PAC is a state general purpose recipient committee sponsored by the Kern County Young Republicans. At all relevant times, Respondent Williams was the treasurer for both the committee and the slate mailer organization.

### Count 1

At all relevant times, Western Pacific Research, Inc. ("WPR"), a political consulting firm, was a consultant for Respondent Voting Guide. In this capacity, during the reporting period ending May 22, 2010, WPR made a payment in the approximate amount of $27,020 to The Ad Edge on behalf of Respondent Voting Guide in connection with the production of a voting guide mailer.

On its campaign statement for the period ending May 22, 2010, Respondent Voting Guide reported the amount in question as an accrued expense and listed WPR as the creditor, but The Ad Edge was not reported as a subvendor.[2]

In this way, Respondents Voting Guide and Williams committed one violation of Section 84219, subdivision (h)(5).

## Count 2

On or about June 3, 2010, Respondent PAC sent a mailer in support of Zack Scrivner's candidacy for the Kern County Board of Supervisors. The mailer cost approximately $5,978 and was an independent expenditure.

Respondents PAC and Williams were required to report the expenditure by filing a late independent expenditure report within 24 hours, but they failed to do so.

In this way, Respondents PAC and Williams committed one violation of Section 84204.

## Count 3

Regarding the independent expenditure in the form of a mailer that is the subject of Count 2, Respondents PAC and Williams were required to disclose Mr. Scrivner as the candidate who received the benefit of the independent expenditure on a semi-annual campaign statement that was filed for the period ending June 30, 2010, but they failed to do so.

On the original campaign statement, the cost of the mailer incorrectly was disclosed as an independent expenditure in support of a candidate for California State Assembly, and the name of the candidate was not disclosed. On November 12, 2010, in response to a request from the California Secretary of State, the statement incorrectly was amended to disclose Shannon Grove as the candidate for California State Assembly who received the benefit of the independent expenditure. As stated above, the mailer actually was sent in support of Mr. Scrivner.

In this way, Respondents PAC and Williams committed one violation of Section 84211, subdivision (k)(5).

---

[2] The accrued expense was reported on Schedule F, which reported that approximately half of the accrued expense was paid by Respondent Voting Guide to WPR during that reporting period, and the other half remained outstanding. Later, in response to correspondence from the Enforcement Division, Respondent Voting Guide amended its filing to list The Ad Edge as a subvendor for a payment in the amount of $18,000 from WPR. Although there is some question about the exact amount that should have been reported as a subvendor payment to The Ad Edge, it is undisputed that The Ad Edge should have been listed as a subvendor on the original campaign statement that was filed for the period ending May 22, 2010.

## Count 4

During the reporting period ending June 30, 2010, Respondent Voting Guide produced and sent a slate mailer supporting various candidates. Some of these candidates did not pay for the support of the slate mailer. Respondents Voting Guide and Williams were required to disclose this on a campaign statement filed for the period ending June 30, 2010, but they failed to do so.

In this way, Respondents Voting Guide and Williams committed one violation of Section 84219, subdivision (e).

## Count 5

On or about October 29, 2010, Respondent PAC sent another mailer in support of Zack Scrivner's candidacy for the Kern County Board of Supervisors. The mailer cost approximately $13,604 and was an independent expenditure. Respondents PAC and Williams were required to report the expenditure by filing a late independent expenditure report within 24 hours, but they failed to do so.

In this way, Respondents PAC and Williams committed one violation of Section 84204.

## CONCLUSION

This matter consists of five counts. The maximum penalty that may be imposed per count is $5,000. Thus, the maximum penalty that may be imposed for all five counts is $25,000. (See Section 83116, subd. (c).)

In determining the appropriate penalty for a particular violation of the Act, the Enforcement Division considers the typical treatment of a violation in the overall statutory scheme of the Act, with an emphasis on serving the purposes and intent of the Act. Additionally, the Enforcement Division considers the facts and circumstances of the violation in context of the factors set forth in Regulation 18361.5, subdivision (d)(1)-(6): (1) the seriousness of the violations; (2) the presence or lack of intent to deceive the voting public; (3) whether the violation was deliberate, negligent, or inadvertent; (4) whether the Respondent demonstrated good faith in consulting with Commission staff; (5) whether there was a pattern of violations; and (6) whether the Respondent, upon learning of a reporting violation, voluntarily filed amendments to provide full disclosure.

Regarding Count 1, a recent stipulation involving failure on the part of a slate mailer organization to report subvendor information imposed a penalty in the mid-range. (See *In the Matter of Election Education Guide and Tracey Pomerance-Poirier*, FPPC Case No. 10/980, approved Jul. 12, 2012 [$2,000 penalty imposed for one count failure to report subvendor information].)

The public harm inherent in campaign reporting violations is that the public is deprived of important information such as the amounts expended, the identities of the recipients of such payments, and the reasons for such payments. In this case, the amount in question was significant, comprising roughly half of reported disbursements for that year. Also, in August 2009, Respondent Voting Guide received a warning letter from the Enforcement Division regarding failure to report subvendor information for payments made to WPR in 2004, 2006, and 2008. (Respondent Williams was not the treasurer during those years.) Additionally, in this case, the subvendor information in question was required to be reported before the primary election of 2010, but it was not reported until after the election (thereby depriving the public of important pre-election information).

The foregoing factors justify a somewhat higher penalty than normal, and for this reason, it is respectfully submitted that imposition of an agreed upon penalty in the amount of $2,500 is justified. A higher penalty is not being sought because Respondents cooperated with the Enforcement Division of the Fair Political Practices Commission by agreeing to an early settlement of this matter well in advance of the Probable Cause Conference that otherwise would have been held. Also, there is no history of prior violations of the Act by Respondent Williams.

Regarding Counts 2 and 5, one of the most recent stipulations involving failure to file a late independent expenditure report imposed a penalty in the mid-range. (See *In the Matter of Chico Democrats 08 and Michael Worley*, FPPC Case No. 09/537, approved Jan. 28, 2011 [$2,500 penalty imposed for one count involving violation of Section 84204].)

As stated above, the public harm inherent in campaign reporting violations is that the public is deprived of important information such as the amounts expended, the identities of the recipients of such payments, and the reasons for such payments. In this case, the amounts in question were significant, comprising approximately 20% and 46% for Counts 2 and 5, respectively, of the reported expenditures for that year.

However, it is respectfully submitted that imposition of an agreed upon penalty in the amount of $2,000 per count for Counts 2 and 5 is justified. A higher penalty is not being sought because Respondents cooperated with the Enforcement Division of the Fair Political Practices Commission by agreeing to an early settlement of this matter well in advance of the Probable Cause Conference that otherwise would have been held. Also, there is no history of prior violations of the Act by Respondents PAC and Williams.

Regarding Count 3, one of the most recent stipulations involving a violation of Section 84211, subdivision (k)(5), imposed a penalty in the mid-range. (See *In the Matter of Marin Professional Firefighters Political Action Committee*, FPPC Case No. 06/255, approved Apr. 8, 2010 [$2,000 penalty imposed per count for two counts of violating Section 84211, subd. (k)(5)].)

As stated above, the public harm inherent in campaign reporting violations is that the public is deprived of important information such as the amounts expended, the identities of the recipients of such payments, and the reasons for such payments. In this case, the amount in

question was significant, comprising approximately 20% of reported disbursements for that year. Also, in aggravation, the information in question incorrectly was reported in such a way so as to be misleading. On the original campaign statement, the cost of the mailer incorrectly was disclosed as an independent expenditure in support of a candidate for California State Assembly, and the name of the candidate was not disclosed. On November 12, 2010, in response to a request from the California Secretary of State, the statement incorrectly was amended to disclose Shannon Grove as the candidate for California State Assembly who received the benefit of the independent expenditure. As described above, the mailer actually was sent in support of Mr. Scrivner's candidacy for the Kern County Board of Supervisors

The foregoing factors justify a somewhat higher penalty than normal, and for this reason, it is respectfully submitted that imposition of an agreed upon penalty in the amount of $2,500 is justified. A higher penalty is not being sought because Respondents cooperated with the Enforcement Division of the Fair Political Practices Commission by agreeing to an early settlement of this matter well in advance of the Probable Cause Conference that otherwise would have been held. Also, there is no history of prior violations of the Act by Respondents PAC and Williams.

Regarding Count 4, the most recent stipulation involving violation of Section 84219, subdivision (e), imposed a penalty in the mid-range. (See *In the Matter of Women's Voter Guide and Tracey Pomerance-Poirier*, FPPC Case No. 10/1023, approved May 17, 2012 [$2,000 penalty imposed for one count of violating Section 84219, subdivision (e)].)

The public harm inherent in campaign reporting violations of this sort is that the public is deprived of important information such as whether the slate mailer organization made disbursements to support candidates without receiving compensation therefor from the candidates supported.

In this case, imposition of an agreed upon penalty in the amount of $2,000 is justified. A higher penalty is not being sought because Respondents cooperated with the Enforcement Division of the Fair Political Practices Commission by agreeing to an early settlement of this matter well in advance of the Probable Cause Conference that otherwise would have been held. Also, there is no history of prior violations of the Act by Respondent Williams.

## PROPOSED PENALTY

In summary, it is respectfully submitted that the facts of this case justify imposition of an agreed upon penalty as follows:

| Count | Description | Named Respondents | Penalty |
|-------|-------------|-------------------|---------|
| 1 | Failure to Report Subvendor Information | Voting Guide Williams | $2,500 |
| 2 | Failure to File Late Independent Expenditure Report | PAC Williams | $2,000 |

| 3 | Failure to Report Information re: Independent Expenditure on Semi-annual Campaign Statement | PAC Williams | $2,500 |
|---|---|---|---|
| 4 | Failure to Disclose Candidates Who Did Not Pay to Appear in Slate Mailer | Voting Guide Williams | $2,000 |
| 5 | Failure to File Late Independent Expenditure Report | PAC Williams | $2,000 |
| | | **Total:** | **$11,000** |