**GALATEA DELAPP**
Attorney at Law
1541 E Fairmont Ave.
Fresno, CA  93704
(559) 803 0471

Attorney for Defendant
Bryan Williams

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>BRYAN WILLIAMS,<br><br>　　　　Defendant. | Case No: 24-CR-00199-JLT-SKO<br><br>DEFENDANT'S REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM<br><br>Honorable Jennifer Thurston<br>Date: September 8, 2025<br>Time: 9:00 AM |

## I. INTRODUCTION

Defendant Bryan Williams, through undersigned counsel, respectfully submits this Reply to the United States' Sentencing Memorandum (Dkt. 16). This reply addresses the government's misplaced reliance on its flawed use of an FBI accounting summary to inflate the loss amount, and on a biased, after-the-fact statement.

## II.

**THE FBI REPORT DOCUMENTS FLOW OF FUNDS, NOT PROVABLE LOSS.**

The government's entire argument on the loss amount rests on the flawed premise that the FBI's calculation of $429,778.40 represents the provable loss for sentencing purposes. It does not.

**A. The Report Is a One-Sided Accounting, Not a Forensic Conclusion of Theft.**

The government's report, while forensically accurate in its arithmetic, is forensically incomplete

1

in its conclusion. It often mistakes reimbursements for theft. It documents the mechanism of payment but ignores the purpose without any investigations to thoroughly distinguish between the two and prove the alleged loss.

The government states the FBI "determined that Williams diverted approximately $429,778.40." This is a mischaracterization. The report itself, titled "Analysis of transactions," makes no such determination of illegality. It simply sums every dollar that moved from the committees' accounts to accounts or credit cards in Mr. Williams's name. It makes no distinction between illegitimate theft and legitimate reimbursements for committee expenses whether documented or not. The net figure does not represent a net personal benefit to Mr. Williams; it represents the net flow of funds for what were often legitimate, committee-related expenses that he paid for upfront with his personal funds and which were later reimbursed.

For example, as detailed in Mr. Williams's Sentencing Memorandum and the attached FBI report itself, the transaction details are replete with memo lines describing committee business. (e.g. Dkt. 16-1 election night party (FBI Rpt. Sched. 2, Line 165), voting guide (FBI Rpt. Sched. 2, Lines 151, 153, 155), office depot (FBI Rpt. Sched. 2, Lines 144, 156, 168), storage unit rental (FBI Rpt. Sched. 2, Lines 397, 501, 535), Lincoln Day (FBI Rpt. Sched. 2, Lines 260, 283), voter registration (FBI Rpt. Sched. 2, Lines 264, 265 and many more).

`1. Flawed "Net Benefit" Calculation

The report's "Net Benefit" calculation (Dkt. 16 - Ex1, p6) is misleading. It simply sums all money going to Williams and subtracts money he paid back. This falsely assumes every dollar he received was illegitimate. The report's 'Net Benefit' calculation is a classic example of assuming the conclusion. It labels every single check to Mr. Williams as a loss, without a single inquiry into whether those checks were payment for legitimate expenses he incurred. This was an accounting exercise, not an investigation into fraud.

The report notes 45 transactions from Williams back to the committees totaling $239,237.24. The government frames this as a partial repayment, but it is equally consistent with him depositing funds to cover expenses or replenish accounts after making large purchases. The government asks the court to

2

see the money Mr. Williams paid back as an admission of guilt. It really is simply evidence of an ongoing financial relationship where Mr. Willimas, who was not an accountant with any training, was sloppily moving money in and out, and commingling, to manage the committees' activities and was doing so with no oversight, as required, from anyone else in the organization. The very fact that he was putting large sums into the accounts is inconsistent with the profile of a pure embezzler.

### 2. The "Transactions Benefiting Williams" Are Not Inherently Personal

The report categorizes credit card payments as "Transactions benefiting WILLIAMS" (Dkt 16-1, Page 4). This is a highly prejudicial characterization.

A volunteer treasurer often uses a personal credit card or cash for organizational expenses to earn points/miles or for convenience, especially in small, volunteer-run organizations. Reimbursements are for statement balances or cash transactions and for those with no training can result in commingling personal and organizational charges.

The report labels every payment to a credit card in Mr. Williams's name as a personal benefit. This is not forensically sound. It is common practice for officers of non-profits and political committees to use personal cards for organizational expenses and get reimbursed. Without proof that the charges on that specific statement were for personal items, this categorization is speculative and inflammatory.

### 3. The Scope and Duration Imply Authorization or Acquiescence

The activity occurred over six years (2013-2019) across multiple accounts and involved hundreds of transactions. Such a sustained and visible pattern suggests that this was either an authorized method of layperson accounting operation or, at a minimum, that the committees were aware of the financial flows and did nothing to stop it, implying consent or poor oversight rather than criminal concealment in all cases. This was a six-year-long financial relationship involving hundreds of transactions. The scale and duration themselves suggest this was an accepted, if sloppy, way of managing the committees' finances, not always a clandestine theft.

The government bears the burden of proving loss by a preponderance of the evidence. *United States v. Kilby*, 443 F.3d 1135, 1141 (9th Cir. 2006). It cannot meet this burden by simply pointing to a spreadsheet of transactions and ignoring the obvious, documented business purposes for many of them,

or investigating whether some transactions were credit card reimbursements or reimbursements for cash extended for legitimate committee expenses. The FBI report is evidence of flow, not conclusive evidence of fraud for every transaction in the report.

### B. The Authoritative, Investigated Findings of the FEC Control.

In contrast to the FBI's mechanical tally, the Federal Election Commission (FEC), the federal agency with primary jurisdiction over the campaign finance violations at issue, conducted a full investigation and reached a definitive conclusion. The FEC Conciliation Agreement (Dkt 15 - Ex. A to Def. Memo.) states there "approximately $272,000 in unauthorized disbursements," of which Mr. Williams repaid $218,546.30. The $272,000 figure included prohibited commingling, conduct that is not necessarily representative of theft in all instances, but includes sloppy accounting.

Mr. Williams, who was not an accountant and had no formal accounting experience, was not keeping double entry accounting level records. Kern County Republican Central Committee (KCRCC) knew of this and failed to remedy this issue with any kind of required due diligence or oversight for years. Much of the "commingling" issues were not simply theft, they were a failure of non-professionals, both the committee and Mr. Williams to implement professional procedures for years. The victim committee itself, agreed with the FEC figure, a figure for which they have their own liability for lack of oversight, in its own FEC Negotiated Settlement (Dkt. 15 - Ex. B to Def. Memo.). The government's own decision not to seek restitution is a tacit admission that it cannot prove the higher figure at trial.

Finally, the government's attempt to rely on an early, third-party "estimate" of $400,000-$500,000 from an FBI Electronic Communication (cited in Dkt. 16 Gov't Memo, and Dkt. 15 Ex. C to Def. Memo.) is perplexing, as this speculative estimate from 2019 was superseded by the FEC's actual, investigated findings in 2021 and by the fact that they have not cooperated with the Government to document and seek restitution for this inflated figure.

The Court should rely on the conclusive FEC agency determination of the commingling, whether theft related or not theft related, and not a stale, preliminary guess.

4

## II.

## THE LATE-ACQUIRED, SELF-SERVING "INTERVIEW" LACKS CREDIBILITY AND PROBATIVE VALUE.

The government's attempt to rebut Mr. Williams's voluntary acceptance of responsibility relies on an interview (Dkt. 16 Ex. 2) conducted years after the events in question with a representative of the very committee that has a clear motive to minimize its own culpability and oversight failures.

**A. The Interview is a Self-Serving Rebuttal Devoid of Reliability.**

The timeline is revealing and dispositive:

2019: Mr. Williams confesses, resigns, and begins repaying restitution.

2021: Mr. Williams & the Committees Settle FEC Violations

2022: Mr. Williams voluntarily meets with the FBI and again admits his guilt in full.

2024: Two years later, only after Mr. Williams asserted his voluntary disclosure as a mitigating factor does the government seek out a member of the victim committee to obtain a statement contradicting this fact.

This sequence demonstrates the statement's purpose: not to uncover truth, but to serve as a pre-sentencing rebuttal tool. The witness's credibility is severely undermined by their inherent bias. The KCRCC has every incentive to portray itself as a vigilant entity that "caught" Mr. Williams to deflect from its own profound lack of internal financial controls, a failure explicitly documented in the FEC's own findings (Dkt. 15 Ex. B - FEC Negotiated Settlement at 2, ¶5).

This after-the-fact statement, elicited by the government long after the fact from a biased source, is not credible evidence. It should be afforded little to no weight by the Court.

**B. Assuming Arguendo He Was Confronted By the Committee, His Extraordinary Acceptance is Unchanged.**

Even if the Court were to consider this unreliable statement, it does not diminish Mr. Williams's acceptance of responsibility in the slightest. The critical facts are unchanged:

5

Upon allegedly being confronted, he immediately admitted everything. He did not deny, obfuscate, or blame others.

He immediately resigned from his position.

He did not wait for charges or a lawsuit; he immediately began repaying the money, ultimately returning over $218,000 years before an indictment was ever filed or the FEC became involved.

He voluntarily sat with the FBI without a lawyer and again admitted his conduct in full.

He voluntarily tolled the statute of limitations while loss amounts were being investigated by the Government as this was the only issue to resolve.

He pleaded guilty at the first opportunity waiving an indictment.

Whether he walked in unsolicited or told the full truth the moment he was asked is a distinction without a difference. The government's own agreement to a 2-level downward variance is a direct acknowledgment of this fact.

### III.

### CONCLUSION

The government's sentencing position relies on an unreliable statement from a biased source, an inflated and unproven loss figure, and an attempt to downplay Mr. Williams's documented, extraordinary acceptance of responsibility. The Court should: 1. Afford no weight to the government's Exhibit 2, 2. Sustain the objection to the loss amount and find the intended loss is $228,274, resulting in a 10-level increase under USSG §2B1.1(b)(1)(F), 3. Apply the 2-level downward variance for acceptance of responsibility as agreed upon by the government, 4. Find that the purposes of sentencing under 18 U.S.C. § 3553(a) are best served by a sentence of probation, as detailed in Mr. Williams's Sentencing Memorandum.

Respectfully submitted,

Dated: September 3, 2025

By: /s/ Galatea R. DeLapp
Galatea R. DeLapp, Esq.
Attorney for Defendant
Bryan Williams

6